UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:05 CR 38 HEA |
| ) | DDN |
| KENNY LYNN TOLLISON and ) | |
| TERRY L. WILLIAMS, ) | |
| ) | |
| Defendants. ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the Court upon the pretrial motions of defendant Kenny Lynn Tollison which were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). An evidentiary hearing was held on April 28, 2005. Following the hearing, the parties filed post-hearing memoranda.

Defendant Kenny Lynn Tollison has moved to suppress tangible evidence (Doc. 19). From the evidence adduced at the hearing, the undersigned makes the following findings of fact and conclusions of law:

**FACTS**

1. At approximately 5:15 p.m. on May 1, 2004, Sikeston, Missouri, Police Sergeant Chris Rataj, a narcotics detective experienced in the investigation of illegal methamphetamine manufacture,[1] while he was off duty at home, received a telephone call from an employee of a Family Dollar Store in Sikeston. The employee described to Rataj suspicious activity of two store customers. The employee said the two arrived at the store in a blue truck, but separated upon entering the store. One went to the cold medicine aisle and purchased cold medication that contained

---

[1] Before May 1, 2004, Det. Rataj had investigated approximately 100 persons per year who purchase methamphetamine precursor chemicals. Approximately 25 persons per year purchase such chemicals from the retail Family Dollar Stores and other retail stores. In these investigations, Det. Rataj interviewed many people about how they go about purchasing these chemicals. He has also made presentations to retail businesses in the Sikeston area about this illegal activity.

ephedrine, a well known methamphetamine precursor chemical. The other person selected similar medication to buy, but replaced it on the shelf, and left the store. The two rejoined at the blue truck and drove away from the store. To Rataj, this information was similar to information he had received from the store one week earlier.[2]

2.  After he received the telephone call, Det. Rataj went about his personal business. Soon thereafter he observed the same blue truck, a 1984 Ford Ranger, at the Super D retail store, where he knew cold medication could be purchased. From his experience he knew that methamphetamine traffickers often purchase the same precursor chemicals at different stores to amass a sufficient quantity for making methamphetamine. Rataj contacted the Super D pharmacy and was told that a customer was then purchasing the cold medication. Rataj also radioed the police dispatcher to assign a uniform officer to stop the truck.

3.  At approximately 6:00 p.m., Sgt. Andrew Cooper and Officer Brian Dover, both in uniform and on duty in separate patrol cars, were dispatched to assist Rataj. Det. Rataj advised Cooper that the occupants of the truck had purchased ephedrine pills. Shortly thereafter, Cooper stopped the truck, with his vehicle's emergency lights. The stop was made solely at the direction of Det. Rataj; Sgt. Cooper did not see the blue truck violate any traffic law. Two persons were in the truck; defendant Kenneth Lynn Tollison was the driver and co-defendant Terry Williams was the passenger. Cooper observed that, as the truck was being stopped, the driver made a motion as though reaching under his seat. Sgt. Cooper believed it was possible the driver was secreting a weapon and he was concerned for his safety. He exited the police car and walked to the truck. He asked the driver for identification; the driver identified himself as Kenneth Tollison. Cooper directed Tollison to get out of the truck, which he did.[3] Cooper saw that Tollison appeared very nervous and agitated. He was visibly shaking, appearing to be more nervous than

---

[2]In Rataj's experience, such information leads to arrests approximately 95% of the time.

[3]Sgt. Cooper intended to perform a protective sweep of the truck for his safety.

drivers in other traffic stops.  Tollison's apparent agitation increased the officer's concern for safety.[4]

4. Officer Dover arrived just behind Sgt. Cooper at the traffic stop.  Sgt. Cooper told Dover about the furtive movement he had seen the driver make.  Cooper then directed Dover to perform a pat-down search of Tollison; Cooper then proceeded to do a security sweep of the truck.  Officer Dover directed Tollison to raise his hands and keep them in the air so he could pat him down.  Tollison said he would not allow the officer to pat him down; he refused to raise his arms and tried to reach inside the truck's bed.  Dover once or twice more ordered Tollison to keep his hands in the air.  When Tollison refused, Officer Dover told him that he would have to handcuff him to keep him from reaching into the truck bed where the officer could see a tire iron and a cooler.  Dover then told Tollison to place his hands behind his back.  Tollison refused.  Dover then grabbed Tollison's right arm and Tollison struggled to free himself from the officer.  Eventually Officer Dover and Sgt. Cooper gained control of Tollison and patted him down; nothing was found in the pat-down.

5. Officer Dover then took Tollison to the rear of his patrol car and directed Tollison to sit on the ground there.  Tollison sat on the ground and the officers went to interview the passenger of the truck.  Tollison, however, got up cursing and walked around the vehicle toward Dover.  For the officers' and Tollison's[5] safety, Dover placed Tollison inside the police vehicle.  With Tollison there, the officers spoke with the other occupant.  While they were doing so, Tollison continued to holler, curse the officers, and thrash around.  Dover returned to the police car and asked Tollison what the problem was.  Tollison complained that the handcuffs were too tight.  Officer Dover then placed Tollison under arrest for violating a reasonable request of the police officer by earlier refusing the order to keep his hands in the air to allow the pat-

---

[4]From his training, Sgt. Cooper knew that people act erratically when under the influence of drugs.

[5]The stop had occurred next to a street with four lanes of traffic.

- 3 -

down search and by refusing to submit to the subsequent handcuffing.[6] Tollison was then searched and the officer found on his person and seized a quantity of methamphetamine and cigarettes. Officer Dover also searched the truck and seized from it a number of ephedrine pill packs, a video camera, a quantity of marijuana, a police scanner, and purchase receipts.

     6.    Thereafter, Det. Rataj arrived at the scene of the stop. He walked to the passenger side of the blue truck to speak with Williams. There he smelled a strong odor of burnt marijuana emanating from the interior of the truck. Rataj asked Williams to step out of the truck. As Williams did so, he moved very nervously, his jaw popped, he was sweating profusely, his eyes moved very rapidly, and his muscles twitched. Rataj then believed that Williams was high on methamphetamine. He asked Williams whether he had just bought some pseudoephedrine pills. Williams said he did not know what Rataj was talking about. Rataj asked him what he had been doing at the Super D store.[7] Williams answered that they had just been getting something to eat. Rataj asked Williams about the video camera that had been seized. Williams said he did not know anything about it. Rataj then asked Tollison about the camera, but got no answer. Rataj then operated the camera to view the tape cassette in the camera. In his experience drug traffickers frequently film themselves making illicit drugs. Det. Rataj saw such activity on the cassette he viewed in the seized camera.

     7.    On May 2, 2004, Det. Rataj submitted his affidavit in support of his application for warrants to search the residences of Tollison and

---

[6] Refusing to obey the reasonable order of a police officer is a violation of a Sikeston, Missouri, city ordinance. Sikeston City Ordinance No. 4285, dated September 8, 1981, provides in pertinent part:

> Section One – It shall be unlawful for any person within the [city] to refuse to comply with any reasonable order or direction of [any] officer of the Department of Public Safety in the performance [of] his official duties.

Def. Ex. D. The term "reasonable" is not defined by the ordinance.

[7] Rataj saw that Williams wore a tattoo described by the Super D store employee as being on the person who at first picked up and then replaced the cold medication.

- 4 -

Williams. Gov. Ex. C.[8] In his sworn, written affidavit, Det. Rataj described the circumstances of the stop, the preceding information about the observations of Tollison and Williams in the store, the statements of Williams to Rataj at the scene of the stop, the subsequent search of Tollison's truck, and the seizure of items from it, including the video camera. In his affidavit, Rataj also described what was displayed on the video camera cassette. The cassette held images of Tollison and Williams involved in drug-related activities and the recording bore the date of May 1, 2004. The recording appeared to have been made at Tollison's residence and at the residence of Williams's sister. Upon this affidavit, the court issued a warrant to search Tollison's residence at 795 St. Helen St., in New Madrid, Missouri, and, in the execution of the warrant 21 categories of items were seized. See Memorandum of Defendant in Support of Motion to Suppress Tangible Evidence

**DISCUSSION**

Defendant Tollison argues that the items seized from his person, his truck, and his residence should be suppressed, because there was insufficient probable cause for his arrest, and because the Sikeston city ordinance, which formed the basis for the arrest, is unconstitutionally vague.

**A.  Initial Stop of Tollison's Vehicle**

Police do not violate the Fourth Amendment by stopping a motor vehicle when they have reasonable suspicion, based on specific and articulable facts under the totality of the circumstances, that a driver or passenger is involved in criminal activity. Terry v. Ohio, 392 U.S. 1, 25-31 (1968); United States v. Robinson, 119 F.3d 663, 666 (8th Cir. 1997) (quoting United States v. Sokolow, 490 U.S. 1, 7-8, 109 (1989) ("The level of suspicion required to justify a stop is, however, 'considerably less than proof of wrongdoing by a preponderance of the evidence' and must be evaluated under 'the totality of the circumstances.'")).

---

[8]No evidence was offered at the hearing about the execution of the search warrant on either residence.

- 5 -

On the instant facts, Sgt. Cooper had the requisite cause to stop Tollison's vehicle. Sgt. Rataj, an experienced narcotics officer, was contacted by a store employer who witnessed one man purchase a known methamphetamine precursor (ephedrine), and another man select similar pills (ultimately replacing them on the shelf), and the two men leaving together in a blue truck. This information was similar to information that Sgt. Rataj had received one week prior. Sgt. Rataj then saw the blue truck at a retail store where he knew pseudoephedrine was sold, and a contemporaneous sale of pseudoephedrine was confirmed by a store employee. Sgt. Rataj notified Sgt. Cooper and Officer Dover that the occupants of the truck had been purchasing pseudoephedrine pills. Ultimately, Sgt. Cooper stopped the truck, and Officer Dover subsequently arrived on scene.

In Sgt. Rataj's experience and training, it was his belief that Tollison was engaged in purchasing sufficient quantities of pseudoephedrine to manufacture methamphetamine. His background and familiarity with those involved in methamphetamine production, coupled with the observations of the store employee provided sufficient reasonable suspicion to justify stopping the truck. See Terry, 392 U.S. at 25-31. An officer's authority to stop a vehicle based on reasonable suspicion is not vitiated merely because the officer did not witness the suspicious activity directly, but was so informed by a fellow officer. Cf. United States v. Juvenile TK, 134 F.3d 899 (8th Cir. 1998) (finding reasonable suspicion when a vehicle was stopped based on two dispatches identifying a male in a grey car who was engaged in suspicious activity). Sgt. Rataj's knowledge and observations were enough to provide "something more than an inchoate and unparticularized suspicion or hunch" for Sgt. Cooper to stop the vehicle. Alabama v. White, 496 U.S. 325 (1990) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)).

**B. Tollison's Arrest**

When the officers approached the vehicle, they viewed Tollison, as the driver, make a furtive movement toward underneath the seat. At that point, Sgt. Cooper believed Tollison could have been handling or searching for a weapon, and subsequently reasonably feared for his safety. Upon approaching the vehicle, Cooper asked for identification and directed Tollison to step out of the vehicle. Once an officer makes a traffic

stop, the officer may engage in activities such as checking the driver's license and registration and asking the driver about his destination and purpose. United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994) (en banc). Furthermore, it is constitutionally permissible for a police officer to request that occupants exit a vehicle. United States v. Boucher, 909 F.2d 1170, 1173 (8th Cir. 1990).

Sensing Tollison appeared inordinately agitated and nervous, and knowing that people often act erratically while under the influence of narcotics, Sgt. Cooper directed Officer Dover to do a pat-down search of Tollison and a protective sweep of the truck. The facts known by Sgt. Cooper were sufficient to authorize a pat-down frisk of defendant's outer clothing for the officers' safety, Michigan v. Long, 463 U.S. 1032, 1049 (1983), as a reasonably prudent person in Sgt. Cooper's position would be warranted in believing that his safety or that of others was in danger. Terry, 392 U.S. at 27. Moreover, the officers were authorized to engage in a protective sweep of the vehicle, as "officers can check for weapons and may take any additional steps that are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" United States v. Thomas, 249 F.3d 725, 728 (8th Cir. 2001) (quoting United States v. Hensley, 469 U.S. 221, 232 (1985)). Given the officer's suspicion that Tollison was under the influence of narcotics, coupled with the furtive movement towards the underside of the seat, it is reasonable to conclude the officers were acting pursuant to legitimate safety concerns.

The undersigned further concludes that Tollison's arrest was valid. Tollison argues that there was no probable cause for arrest, and that the ordinance he was arrested under is unconstitutionally vague. In opposition, the government cites to Michigan v. DeFillippo, 443 U.S. 31 (1979).

In DeFillippo, defendant was arrested pursuant to a city ordinance that allowed police to detain any person upon reasonable cause to believe the person's behavior warrants further investigation, and that it was unlawful for anyone stopped pursuant to this provision to refuse to provide evidence of identification. Id. at 33. After the defendant's arrest, the ordinance was declared unconstitutionally vague. Id. at 34. The issue before the Supreme Court was whether defendant's arrest under the ordinance, and search pursuant thereto, was invalid because the ordinance was deemed unconstitutional.

The Court answered the issue in the negative. It concluded that the officer had "abundant probable cause to believe that [defendant's] conduct violated the terms of the ordinance[,]" and the fact that the ordinance was later found unconstitutional had no bearing on the officer's duty to enforce the law while still in effect. Id. at 37-38. The Court reasoned that "A prudent officer, in the course of determining whether [defendant] had committed an offense under all the circumstances shown by this record, should not have been required to anticipate that a court would later hold the ordinance unconstitutional." Id. at 37.

Following DeFillippo, whether or not the instant ordinance is unconstitutional is not relevant to whether there was probable cause for Tollison's arrest. There are no facts in evidence to suggest that the ordinance was declared unconstitutional prior to the arrest, or that it is "so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaw." Id. at 38. Accordingly, for the purposes of the suppression motion, the undersigned will not entertain the constitutionality of the ordinance in question. The undersigned will discuss, however, whether Officer Dover had probable cause to believe that Tollison's behavior violated the ordinance.

Probable cause to arrest without a warrant exists when the police have information sufficient to cause a reasonable person to believe that the defendant had committed an offense or was then committing an offense. Beck v. Ohio, 379 U.S. 89, 91 (1964); United States v. Sherrill, 27 F.3d 344, 347 (8th Cir.), cert. denied, 513 U.S. 1048 (1994); United States v. Williams, 897 F.2d 1430, 1435 (8th Cir. 1990). This determination does not depend on individual facts, but depends on the cumulative effect of the facts in the totality of the circumstances. United States v. Brown, 49 F.3d 1346, 1349 (8th Cir. 1995). Moreover, an arrest warrant is not required when police officers have probable cause to arrest a suspect who is riding in an automobile on a public street. United States v. Czeck, 105 F.3d 1235, 1238 (8th Cir. 1997).

Taking into consideration the totality of all facts and circumstances, the undersigned concludes there was probable cause for Officer Dover to conclude that Tollison violated the ordinance by refusing to obey the reasonable requests of a police officer.

Officer Dover asked Tollison to raise his hands in the air for the pat-down search.  Despite the fact that Officer Dover ordered Tollison on one or two occasions to keeps his hands in the air, Tollison said he would refuse to be subjected to a pat-down, he refused to raise his hands, and he tried to reach inside the truck bed where the officers saw both a tire iron and a cooler laying in the truck bed.  The officers next asked Tollison to put his hands behind his back in order to be handcuffed to effect the pat-down.  Officers are within their authority to handcuff individuals, for a limited time period, to allay safety concerns.  See United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992).  Tollison refused and struggled to break free when Officer Dover grabbed his right arm.  Ultimately, the officers placed Tollison in handcuffs.

Tollison was then directed to the rear of the patrol car and asked to sit and stay in that location.  Tollison sat down, began cursing, got up, and walked toward Officer Dover.  Tollison was then placed in the back of the patrol car for the safety of the officers, and his own safety due to the heavily-trafficked roadway.  Officers then turned their attention to the vehicle's passenger, Terry L. Williams; however, Tollison continued to curse, yell and thrash about in the patrol car.  Upon being asked the reason for his behavior, Tollison said the handcuffs were too tight.  Tollison was then arrested for violating the reasonable requests of a police officer when he refused to keep his hands in the air to effect the pat-down search, and when he refused to submit to the subsequent handcuffing.

While "reasonable" is not defined under the ordinance, the often consulted and referenced Black's Dictionary defines reasonable as "Fair, proper, or moderate under the circumstances."  Black's Law Dictionary 1272 (7th ed. 1999).  Clearly, given that the officers were investigating for potential criminal narcotics activity, the officers were concerned that Tollison may be under the influence, and about Tollison's furtive movement toward the floorboard and the tire iron in plain-view in the truck bed.  It was reasonable for the officers to request that Tollison maintain his arms in the air during the pat-down, that he not put his hands in the truck bed, and after failing to comply with those requests, it was further reasonable for the officers to request that Tollison submit to being handcuffed to effect the limited search.  Tollison's response to the reasonable orders of the officers was to refuse to comply and to continue to engage in behavior

they requested he cease.  Tollison's actions amounted to a violation of the ordinance.

Whether Tollison's actions could later be determined a criminal violation of the ordinance is irrelevant to the validity of the initial arrest.  See DeFillippo, 443 U.S. at 36.  It is only necessary that he refused to obey the reasonable orders of a police officer.  On these facts, the totality of the circumstances suggest this is so.

Accordingly, Tollison's arrest was valid.

**C.     Search of Tollison and His Vehicle**

Because Tollison was in fact under lawful arrest, the items seized from his person should not be suppressed.  "[I]f an officer has arrested the individual, the officer may search the individual's person incident to that arrest and may reach into his pockets."  United States v. Pratt, 355 F.3d 1119, 1121 (8th Cir. 2004); United States v. Robinson, 414 U.S. 218, 226 (1973).  "[I]n the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment."  United States v. Edwards, 415 U.S. 800, 803 n.3 (1974).  In order to effect a search incident to arrest, it is not necessary that the officer believe the arrestee is armed or concealing evidence of a crime on his person; the arrest itself enables the officer to conduct the search.  Pratt, 355 F.3d at 1121.

Accordingly, the items seized from Tollison's person subsequent to his arrest were lawfully obtained and should not be suppressed.

With respect to the vehicle search, the Fourth Amendment allows an officer to search a vehicle's passenger compartment as a contemporaneous incident of arrest, even when officers do not make contact until the person arrested has already left the vehicle.  Thornton v. United States, 541 S. Ct. 2127, 2130-31 (2004); New York v. Belton, 453 U.S. 454, 461 (1981); United States v. Poggemiller, 375 F.3d 686, 687-88 (8th Cir. 2004).

Because Tollison's arrest was lawful, the evidence found upon search of the vehicle was validly obtained as incident to that arrest.  Any evidence seized from the vehicle should not be suppressed.

**D. Search of Tollison's Residence**

In his suppression motion, Tollison argues that the items seized upon execution of the warrant on his residence are "fruits of the poisonous tree" and should be suppressed under the exclusionary rule. See <u>United States v. Fellers</u>, 397 F.3d 1090, 1094-95 (8th Cir. 2005) (discussing exclusionary rule); <u>United States v. Hessman</u>, 369 F.3d 1016, 1021-22 (8th Cir. 2004) (same). Since the facts do not support the existence of a "poisonous tree," the court having concluded that the arrest and vehicle search were lawful, any "fruits" obtained from the residence search should not be suppressed based on the exclusionary rule.

The evidence seized incident to Tollison's arrest was lawfully considered in determining whether there was probable cause to issue the search warrant. "Probable cause to issue a search warrant exists when the supporting affidavit sets forth sufficient facts to lead a prudent person to believe that 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" <u>United States v. Sundby</u>, 186 F.3d 873, 876 (8th Cir. 1999) (quoting <u>United States v. Johnson</u>, 64 F.3d 1120, 1126 (8th Cir. 1995)). Such a determination is to be based upon the "the totality of the circumstances." <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983). In other words, the task of the issuing judge is to make "a practical, common-sense decision whether given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Id.</u> (internal quotations omitted); <u>United States v. Coleman</u>, 349 F.3d 1077, 1083 (8th Cir. 2003).

The undersigned concludes that the judge had a substantial basis, based on the totality of circumstances, for concluding that probable cause existed for issuing the warrant. The affidavit in support of the warrant details facts showing that Tollison possessed methamphetamine, quantities of pseudoephedrine, and marijuana. The affidavit further details the content of the video found during the search of the vehicle showing, *inter alia*, Tollison involved in various narcotics-related activities at his residence. Moreover, Rataj notes that Tollison was well-known to officers for being involved in methamphetamine production. (Doc. 20, Ex. B.)

Given the totality of the circumstances scribed within the four corners of the affidavit, there was probable cause for the issuing judge to conclude that evidence of criminal activity would be located at Tollison's residence. Accordingly, the evidence obtained thereof should not be suppressed.

Whereupon,

**IT IS HEREBY RECOMMENDED** that the motion of defendant Tollison to suppress tangible evidence (Doc. 19) be denied.

The parties are advised they have ten (10) days to file written objections to this Report and Recommendation. The failure to file objections may result in a waiver of the right to appeal issues of fact.

## NOTICE TO SET CASE FOR TRIAL

This Report and Recommendation having been issued by the undersigned United States Magistrate Judge,

**IT IS HEREBY ORDERED** that, pursuant to the Administrative Order of this Court, the case be set for trial.

**DAVID D. NOCE**
**UNITED STATES MAGISTRATE JUDGE**

Signed on May 25, 2005.